NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CHARLENE C. DEMARCO | : | Hon. Joseph H. Rodriguez |
| | : | |
| Petitioner, | : | No. 07-4249 (JHR) |
| | : | |
| v. | : | |
| | : | **OPINION** |
| UNITED STATES OF AMERICA | : | |
| | : | |
| Respondent. | : | |

This matter comes before the Court on Petitioner Charlene C. DeMarco's[1]

("DeMarco" or "Petitioner") petition to vacate, set aside, or correct her sentence

pursuant to 28 U.S.C. § 2255. DeMarco asserts an ineffective assistance of counsel

claim, alleging that her trial attorney–Jack McMahon[2]–did not inform her of her right to

testify at trial. Testimonial hearings were held on June 11 and 16, 2008, and on

September 3, 2008. For the reasons expressed below, DeMarco's petition is denied.

### I. Factual & Procedural Background
### A. Pretrial

A federal grand jury sitting in the District of New Jersey, Camden Vicinage,

returned an eleven-count Indictment, Criminal No. 06-240, against Charlene C.

DeMarco and Elizabeth Lerner on March 29, 2006. (See generally, Indictment filed

3/29/2006.) That indictment charged Defendants with one count of conspiracy in

---

[1]     Charlene C. DeMarco is a Doctor of Osteopathic Medicine ("D.O."), who prior to this conviction specialized in the treatment of Lyme Disease. (See Pet'r Ex. 1, 1-4.)

[2]     Jack McMahon is a criminal defense attorney who has practiced in that capacity for the last eighteen years. Prior to that, McMahon worked for twelve years in the District Attorney's Office of Philadelphia, Pennsylvania. (McMahon Dep. 5:5-12.)

violation of 18 U.S.C. § 371, three counts of mail fraud in violation of 18 U.S.C. § 1341 and 2, six counts of wire fraud in violation of 18 U.S.C. § 1343 and 2, and one count of money laundering in violation of 18 U.S.C. § 1957 and 2.  (See Indictment 1-19.)  These charges resulted from Defendants' plan to defraud patients suffering from Amyotrophic Lateral Sclerosis ("ALS"), more commonly known as Lou Gherig's Disease.  (Indictment ¶ 12.)

Specifically, DeMarco claimed that she could cure patients with ALS by using pioneering stem cell technology.  Relying upon their hopes for a cure, DeMarco took substantial sums of money from patients and their respective relatives.  DeMarco then deposited the money in a bank account only to later spend it on herself.  DeMarco spent the money on, among other things, a barbeque and a three-night stay at a southern New Jersey hotel and winery.  She admitted as much at the testimonial hearings held in June and September for this very petition.  (Hr'g Tr. 60:18-21, June 11, 2008; Hr'g Tr. 152:14-23, 155:14-21, 190:2-22, Sept. 3, 2008.)  Needless to say, the plan executed by DeMarco and Lerner caused serious financial and emotional harm to her patients and their friends and family.

### B. Trial

Before detailing the facts of trial, it must be noted that certain alleged trial facts were only recently revealed during the § 2255 hearings.  These alleged facts are in dispute.  Because these alleged facts are interwoven with the actual record of trial, they are nevertheless included in this section, where appropriate.

The Government's case was presented to the jury in several days, ultimately concluding on December 5, 2006.  During their case-in-chief, the Government put forth

several victims who testified that they were misled by DeMarco.  (June Hr'g 219:11-15.)
These victims also testified to a sense of financial urgency that was created by DeMarco,
if a cure was to be obtained.  (Id. at 73:10-14.)  In response to this urgency, the victims
and their respective families testified that they held block parties to raise money to send
to DeMarco.  (Id.)

Defendants, in response, put forth several character witnesses and rested their
case one day after the Government, on December 6, 2006.  Two days prior, on
December 4, 2006, the Government sought to identify the witnesses that Defendants
intended to call.  That question resulted from scheduling concerns at the time.  The
following exchange occurred in open court:

| | |
|---|---|
| Gov't: | I guess the only question that I would have at this juncture is who the defense intends to call.  We don't have any names– |
| McMahon: | Judge, the only -- I will try to provide counsel with those names of character witnesses this afternoon before we leave, as soon as we leave here. |
| Gov't: | And so it's clear, the only witnesses -- |
| McMahon: | Character witnesses or the defendant. |
| Gov't: | Well, do we know that yet?  Because I think it will depend on -- |
| The Court: | We'll have to know that for the charge. |
| McMahon: | What's the question? |
| Gov't: | Whether or not if either of the defendants are testifying? |
| McMahon: | Judge, I can't speak for Mr. Duca[3] obviously; *my client has not yet made this decision.* |

---

[3]     Mr. Duca represented Co-Defendant Elizabeth "Liza" Lerner.

3

The Court:     *Obviously it is the client's decision.*

McMahon:     *Right.  And we will make this decision sometime tomorrow
after the Government rests.*

The Court:     All right.

(Trial Tr. 189:22-25, 190:1-16, Dec. 4, 2006.) (emphasis added).  Even though she sat

one seat away from McMahon during trial, (see Hr'g Tr. 24:14-15, June 11, 2008),

DeMarco contends that she cannot recall this exchange.  (Sept. Hr'g Tr. 139:3.)  If she

could recall, then obviously DeMarco would have known that the decision of whether or

not to testify was her's to make.  On direct examination at the September § 2255

hearing,  DeMarco's new attorney asked her about the significant exchange cited above:

Lord:          Do you recall the interchange with the Court toward -- after Mr.
Petry finished testifying the first day towards the end of the day
where there was some discussion between Judge Rodriguez and
Mr. McMahon?

DeMarco:      Yes, I remember.  All I heard was the word testify.  Now that
Judge Rodriguez has read it to me, I see it in its completeness,
but at the time I heard the word testify.  That was it.

(Sept. Hr'g Tr. 138:24-25, 139:1-6.)  DeMarco first attributed this inability to recall to

hearing difficulty.[4]  During cross-examination, however, DeMarco seemed to contradict

---

[4]     She testified that her hearing problem, which allegedly is traceable through all
her family, was aggravated by a head injury during incarceration.  (Sept. Hr'g Tr. 139:15-18.)

Lord:          Do you have any problems with your hearing, Doctor?

DeMarco:      Uh, now or --

Lord:          Then?

DeMarco:      At that time?

Lord:          At that time?

4

herself.  The true reason behind her inability to recall apparently resulted from the

stress of trial.  DeMarco testified, "You got to understand in that courtroom everything

became a bit of a blur…"  (Id. at 184:17-19.)  Pressing DeMarco on this point, the

Government followed up:

> Gov't:     [D]id you not hear it because you weren't paying attention or
>            did you not hear it because of this hearing problem that goes in
>            your family?
>
> DeMarco:   I think that it very well could have been a mixture of the two,
>            don't you?  I mean, I was paying as much attention as I could.
>            Listening to everything that I could.  Certainly do have a
>            hearing problem.  So I think it was a little bit of each.  But, you
>            know, did I hear anything beyond the word testify?  No.

(Id. at 185:6-14.)

This issue of potential witnesses was raised once again during the next day of

trial, December 5, 2006.  In the context of discussing trial logistics and scheduling,

McMahon stated:

> Judge, we will be prepared to go in the morning, and the evidence in the
> morning will be a number of character witnesses, not that many, not any
> extraordinary number.  And either Charlene DeMarco or–will rest.

(Trial Tr. 193:9-13, Dec. 5, 2006.)  These remarks represent the last time the issue of

potential defense witnesses, including DeMarco herself, was discussed in open court.

---

> DeMarco:   Yeah.  Uh, I -- yeah.  My father had a form of nerve deafness and it's
>            been consistent in all our DeMarco family.  My Aunt Lena had and
>            my father had it and I have it to a degree.  Now since the head injury
>            at Alderson [Federal Prison Camp], it's been a lot worse.  There are
>            times that I -- but this ear has always been worse than the other. And
>            it's just over the years become worse and worse and I would imagine
>            by the time I'm 70, I'll be pretty much like my dad and just not be
>            able to hear very well at all.  I had a hearing aid in both ears.

(Id. at 139:14-22.)

While the above remarks speak for themselves, there is a dispute as to what occurred after court that day during the evening hours of December 5, 2006, as well as during the morning hours of December 6, 2006.  On this topic, McMahon consistently testified at both his deposition and the September hearing.  After Court adjourned early on December 5, 2006, McMahon took DeMarco into a small room outside the courtroom.  There, he conducted a brief mock cross-examination of DeMarco. (McMahon Dep. 58:12-16.)  Upon hearing her answers to the mock examination, McMahon advised DeMarco not to testify.  According to McMahon, he believed that her answers were insufficient to persuade a jury.  He stated, "She had no answers.  Her answers were like, I don't know.  I don't know.  I bought a microscope.  Well, do you have a receipt for it?  No, I don't."  (Id. at 58:22-24.)  The testimony of Diane Reimer at the June hearing confirms these events, see infra, while the testimony of DeMarco rejects the characterization of "mock cross-examination."

| | |
|---|---|
| Gov't: | You remember Jack McMahon practicing some cross-examination with you; don't you? |
| DeMarco: | Practicing cross-examination?  No.  Just asking -- |
| Gov't: | Asking you questions? |
| DeMarco: | No.  Asking me about receipts.  He hammered away at the receipts. |

(June Hr'g Tr. 214:9-14.)  Despite the dispute over the characterization or labeling of the examination of DeMarco by McMahon, there is no question that, at minimum, a brief examination occurred after court adjourned on December 5, 2006.

Similarly, there is no question that McMahon spoke with DeMarco during the evening of December 5, 2006 and during the morning of December 6, 2006 about

whether DeMarco would testify.  The dispute here is whether DeMarco agreed not to testify, thereby waiving this constitutional right.  According to McMahon, these discussions were apparently no different from the discussions that occurred throughout the case; specifically, DeMarco wanted to testify, he advised her not to, and she eventually accepted his professional advice.  The following lengthy exchange between McMahon and DeMarco's new attorney lends weight to McMahon's version of events:

Lord:           She was pleading with you to testify throughout.

McMahon:        She was not.  You're making a representation that's not true.

Lord:           Okay, you're denying that she was pleading.  You are aware she testified on the 11th and we have that transcript.

McMahon:        She never pleaded with me.  You're acting like she was kneeling down on the floor with her hands up in the air saying I want to testify, I want to testify.  Doctor DeMarco is a smart woman. Doctor DeMarco and I had intelligent discussions of these issues.  There was no pleading or begging or anything ... Doctor DeMarco is smarter than many, many of the clients that I had over the years.  And you know, some people you talk about certain concepts of right to testify.  Maybe sometimes you're not sure whether they get it.  She got it.  We talked about it.

Lord:           How many times did you tell her that the ultimate decision as to whether to testify is hers and not yours to make?

McMahon:        God.  Many, many times ... [S]he knows as she's sitting there that I never would ever tell any client that she cannot testify. I mean first of all, it doesn't do me any good to tell them that. I never said that to her.  I never said it to any client ... Why would I do that?  I didn't do that.

Lord:           Okay.

McMahon:        Doctor DeMarco and I ... talked about this on and off during trial.  We talked prior to trial.  And then when the government rests, when all is said and done, you got to make that call.  And we discussed it.  Some of her friends were here.  We discussed it many times.  We sat in the little room out there.  I think we

> even maybe broke early that day ... And we sat in there and
> discussed the pros and cons and everything back and forth
> whether to testify.  And, in fact, what we did do, we did like a
> ten minute ... cross examination.  She had no answers ... And
> I remember saying to her, see, this is what I'm saying to you.
> You're not going to look good in front of the jury not having
> these answers.  You're a doctor.  You're a professional.  People
> are going to expect more out of you than simple answers ...
> These people are going to expect more out of you and you can't
> even answer my questions, much less the government's
> extensive questions ... I told her I thought it would be foolish
> for her to testify.  I thought it would not be strategically sound
> ... I thought it would have been suicide for her to testify.  That
> was my opinion ... But I talked to her and I said to her Charlene
> you got to make that decision.  And I said go home tonight
> based on what we talked about here ... And I believe she called
> me that night and at home ... I believe we talked about it that
> night on the telephone ... about her willingness to testify.  We
> came back that morning.  I got here early.  Talked about
> whether she was going to testify ... I said, what do you want to
> do Charlene.  It's fish or cut bait.  And she agreed not to testify.
> She knew she had the, she knew -- and let's make no mistake
> about this, as crystal clear on this as anything, she knew she
> had the right and the ability to testify.

(Sept. Hr'g Tr. 63:15-25, 64-66:1-16 .)  McMahon further described his discussions with

DeMarco during the morning of December 6, 2006:

> And I did give her my professional advice and I said to her that morning here,
> it's your call now.  It's time for you to make the decision.  All the talk is over.
> I've given you advice.  You talked to your friends.  We've gone over this.  It's
> time to go.  And she said okay, I won't testify.

(Id. at 66:21-25.)  This testimony is consistent with McMahon's original account given at his

April deposition.  There, he testified that he told DeMarco

> If you want to get up there and testify, fine, just be aware that these are the
> questions that are going to be asked and you ... better have some answers for
> them.  And she told me that morning, when we got there, she decided not to --
> in fact, she told me that on the phone the night before and I confirmed it the
> next morning.

DeMarco disputes this account of December 5th and 6th.  She insists that she

never knew it was her decision whether or not to testify.  The following colloquy is

excerpted from the June hearing:

> Lord:        Did you make a decision during your last conversation with Mr.
>              McMahon in the room back there regarding what you were
>              going to do?
>
> DeMarco:     A decision?
>
> Lord:        Yes.
>
> DeMarco:     I had no decision.
>
> Lord:        About to testify.
>
> DeMarco:     I had no decision.  What decision?

(June Hr'g Tr. 33:2-10.)  She further contends that she expressed her desire to testify

throughout the trial, but her will was overborne by McMahon.  For example, she

contends that she "constantly berated him, telling him, 'please let me testify.' "  (<u>Id.</u> at

32:6-7.)  But according to DeMarco, McMahon did not lend a sympathetic ear; "He told

me that it was his decision whether or not I would take the stand.  And, once again,

repeatedly said that I should be a good little girl, and listen to him as my father."  (<u>Id.</u> at

36:11-14.)  When confronted with this account at the September hearing, McMahon

vehemently denied these remarks:

> McMahon:     That's ridiculous.  I never said anything like that.  I'm her daddy.
>
> Lord:        Yeah.  I'm your daddy now and you should listen to me like your
>              daddy.  You never said that to her?
>
> McMahon:     No.  I've never, I've never utter those words to anybody except my
>              daughter and she listen [*sic*].

(Sept. Hr'g Tr. 126:11-16.)  DeMarco persists.  In a rather theatrical portrayal of trial

events, DeMarco claims that, after the last defense witness was called,

> I looked over at the jury.  I pushed my chair back.  I started to rise up, because I was going to address the Court and ask them to let me testify, to let me dismiss Mr. McMahon at that point and testify.  Mr. McMahon stood up rather quickly and said, "the defense rests", and unfortunately, I sat back down.

(Hr'g Tr. 33:18-23, June 11, 2008.)  Candidly, this portrayal of events is more than theatrical; it is a chimerical account that has no foundation in the trial record.  After he finished his direct examination of defense witness John Hobe, the record shows a deliberate, measured approach taken by McMahon:

McMahon:  I have no other questions.

The Court:  Cross.

Gov't:  No questions, Your Honor.

The Court:  All right.  Thank you.

　　　(Witness excused)

McMahon:  *One second, Your Honor.*

　　　(Brief pause)

McMahon:  *If Your Honor pleases, on behalf of Doctor Charlene DeMarco, the defense rests.*

The Court:  Mr. Duca.

Duca:  On behalf of Elizabeth Lerner, defense rests.

The Court:  All right.  There's no rebuttal?

Gov't:  No, Your Honor.

(Trial Tr. 40:11-24, Dec. 6, 2006) (emphasis added).  In short, this record does not exhibit what DeMarco suggests was a frenetic attempt by McMahon to rest.  Due to this factual dispute, however, the Court engaged DeMarco in a direct line of questioning at

the September hearing.  There, Petitioner seemed to retreat from her version of trial events:

> The Court:    [D]id you at any time do anything in the courtroom that would telegraph to the Court that you were uncomfortable with the judgments being made by Mr. McMahon?
>
> DeMarco:    To you?
>
> The Court:    To me.
>
> DeMarco:    No, I don't think you saw me stand...
>
> The Court:    I'm saying at the time when the government rested, did you do anything that would be discernable to me that you were uncomfortable with the judgments being made by Mr. McMahon?
>
> DeMarco:    I guess you know, Lynn [Rotelli] put it best when she said I ... slumped back.  I just slumped back in my chair.  I was defeated.
>
> The Court:    All right.
>
> DeMarco:    I doubt you saw that.
>
> The Court:    You doubt that I saw?
>
> DeMarco:    Yeah.  I just went back in my chair in a semi-standing position.  I don't think you could have known.

(Sept. Hr'g Tr. 195:6-25, 196:1.)  Yet, in her Brief submitted weeks after that September testimony, the characterization of events that day takes a third skew-- "Mr. McMahon said '*wait a minute*,' Petitioner started to rise, and Mr. McMahon *jumped up* and said 'defense rests.' " (Pet'r Br. 34) (emphasis added).

Pointedly, the Court is troubled by the various characterizations of trial events by DeMarco.  From "stood up rather quickly", (June Hr'g Tr. 33:22), to what is now described as "jumped up", (Pet'r Br. 34), DeMarco's liberal use of verbs and adjectives

paints a picture decidedly different from what actually happened in the courtroom on

December 6, 2006.  Even DeMarco's quote is incorrect; McMahon never said "wait a

minute".  (Id.)  Instead, McMahon said, "One second, Your Honor."  (Trial Tr. 40:16,

Dec. 6, 2006.)  DeMarco relies on Lynn Rotelli to corroborate this story, but Rotelli's

version of events has similar inconsistences that undercut her credibility.  See Part II.C.

This testimony, along with the rest of DeMarco's supporting testimony, is addressed

below.

### C. Sentencing and Appeal

On September 10, 2007, DeMarco was sentenced to a 57-month term of

imprisonment on each of the eleven counts, to be served concurrently.  DeMarco then

filed this petition to vacate, correct, or set aside her sentence under 28 U.S.C. § 2255 on

September 5, 2007.  Soon after filing her petition, DeMarco filed motions to proffer

evidence related to her claim [Docket No. 15] and to depose McMahon [Docket No. 16].

This Court granted both motions on January 9, 2008.  [Docket No. 26.]  Jack McMahon

was subsequently deposed on April 11, 2008.  As discussed above, three evidentiary

hearings were held on June 11, 2008, June 16, 2008, and September 3, 2008.

Several witnesses testified for Petitioner, including Petitioner herself, on June 11,

2008.  The following testimony from that hearing represents key excerpts applicable to

this petition.  DeMarco testified first.  When asked how she would have explained to the

jury, without having a single receipt, where the patient money went and how the alleged

medical supplies were purchased, DeMarco explained:

> DeMarco:    Again, they were paid for with money orders, for just about
>             everything I purchased.

| The Court: | Cancelled checks? |
|---|---|
| DeMarco: | Money orders. |
| Ms. Lord: | Money orders.  Okay.  What was your -- you had a jury.  You don't have the receipts.  What was your choice as to handle that situation? |
| DeMarco: | I had two choices; I could tell the jury about it, and let them know exactly what was purchased, or -- and I did this ... I packaged the items.  Brought them into the courtroom, and I wanted Mr. McMahon to show the jury the actual items.  A picture is worth – or an item is worth seeing it in person is worth a thousand words. |

(June Hr'g Tr. 57:14-25, 58:1-7.)  Thus, Petitioner seems to believe that if she testified, she could have then explained to the jury where the money went by pointing to medical supplies in the courtroom.  This tactic, she contends, could have swayed the jury to return a favorable verdict.[5]

The next witness to testify at the June 11th hearing was Jeanne Moos.  Ms. Moos was a patient of Petitioner when she had Lyme disease.  (Id. at 160:1.)  She testified that she took a "little walk out in the hall" during trial with McMahon.  (Id. at 160:9.)  During that walk, McMahon apparently said that he "agonized about putting [DeMarco] on the stand." (Id. at 100:13.) (alteration to original quote.)  By her interpretation, "he was making it very clear that he was the guy making the decisions."  (Id. at 102:24-25.)  When asked if he indicated whether the decision to testify was left to Petitioner, Ms. Moos answered, "No."  (Id. at 160:15-16.)  Notwithstanding any antipathy she felt

---

[5]     Because this contention directly affects Petitioner's claim under Strickland v. Washington, it is properly examined in Part III.B.  See Strickland, 466 U.S. 668, 691-696 (1984) (holding in part that "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.").

towards McMahon, Ms. Moos admitted that she complimented him on his closing statement.  In fact, she told him that "he nailed it."  (<u>Id.</u> at 102:12.)

After Ms. Moos, another former patient of Petitioner testified.  Diane Reimer was treated for Lyme disease by DeMarco, and soon thereafter they became friends.  (<u>Id.</u> at 104:2-3.)  She testified that McMahon called Petitioner "kiddo", which in her view, was "very disrespectful."  (<u>Id.</u> at 105:21-22.)  She further testified that McMahon "just didn't really listen to what she had to say."  (<u>Id.</u> at 22-23.)  Ms. Reimer was there when McMahon conducted the mock cross-examination of Petitioner.  She testified as follows:

> [I]t was almost like they became a prosecutor against her, and were interrogating her in the back ... I was back there with them.  They are asking about the receipts and blah, blah, blah, blah, blah, and you got to go home and get these receipts ... And I thought, whose team are you on?

(<u>Id.</u> at 106:23-25, 107:1-11.)  After that brief examination, Ms. Reimer recalls McMahon telling Petitioner that "he did not think it was in her best interest to testify, and didn't want her to testify."  (<u>Id.</u> at 107:22-23.)  This version of events is consistent with McMahon's portrayal of the mock cross-examination.

Catherine Licciardello, the wife of a former patient of DeMarco, also testified on her behalf at the June 11th hearing.  She was present during a conversation between Petitioner and McMahon during trial.  (<u>Id.</u> at 115:19-20.)  She characterized McMahon as " arrogant" and "absolute".  (<u>Id.</u> at 116:11.)  When asked if he ever told Petitioner that the right to testify was her "ultimate decision", Ms. Licciardello answered, "No.  No.  He was very, very, very direct.  Never – never gave her the opportunity."  (<u>Id.</u> at 117:1-2.)  The following brief colloquy ensued:

Q.     Did he ever say, "I'm not putting you on the stand"?

14

A.     Yes.  *That was his attitude.*

(Id. at 117:3-4.) (emphasis added).  On cross, Ms. Licciardello clarified that McMahon

did not think that the jury would understand DeMarco's testimony.  (Id. at 118:17-18.)

Lynn Rotelli also testified.  She has known DeMarco since 1992,  (id. at 121:11),

and was seated in the second row of the courtroom gallery during the last day of trial.

(Id. at 121:22-23.)  As noted above, Rotelli serves as a corroborating witness for

DeMarco's version of events that allegedly occurred during the last day of trial,

December 6, 2006.

Rotelli testified that DeMarco "actually stood up", only to be followed by

McMahon who stood up real quick and said, "defense rests."  (Id. at 122:7-9.)  Rotelli

quickly explained that DeMarco "was, like, three quarters of the way up out of her

chair."  (Id.)  On cross-examination, Rotelli was asked if DeMarco was "all the way up";

she replied, "she was standing."  (Id. at 126:20-22.)  Thus, there is a question as to

whether Rotelli remembers DeMarco as "standing" or "three quarters of the way up."

Consistent with her inconsistent recollection of this alleged event, Rotelli could neither

recall the name of the last witness for the defense, nor whether that last witness was a

male or a female.  (Id. at 125:3-19.)  Rotelli represents the last notable witness for

purposes of this petition.

Three additional facts surfaced on appeal that must be addressed before

examining the parties' legal arguments.  First, it is important to note that DeMarco

admitted at both the June and September hearing to misusing funds that were given to

her by patients and their families.  (See, e.g., June Hr'g Tr. 60:18-21; Sept. Hr'g Tr.

190:11-13.)  Perhaps even more notable, she stated that had she testified at trial, she

15

would have admitted to misusing those funds on the witness stand.

> Q:   If you testified at that trial, you would have told the jury that you
> misused those funds, correct?

> A:   For those amounts, yes.

(Sept. Hr'g Tr. 191:14-16.) When asked if her attorney knew she would have testified to

misusing the funds, Petitioner insisted–

> No, we never talked about it.  We never talked about that.  We talked about
> the equipment.   We talked about a lot of things, but *I never told Mr.
> McMahon that I would tell the truth on the stand and say that those things
> were not appropriate*.  No, we never talked about that and that is my answer
> to you.

(Id. at 191:20-25.) (emphasis added).

Second, DeMarco secretly recorded two telephone conversations that she had

with Jack McMahon shortly after trial.  She testified at the September hearing about

these conversations.  When asked during cross-examination why she taped Mr.

McMahon twice, DeMarco said she wanted proof.  (Id. at 192:17-18.)  The following

colloquy ensued:

> Q.   You already knew.  Prove to whom?

> A.   To me.

> Q.   You wanted to prove to you what you had heard already?

> A.   I wanted to have something, yes, something that was solid.  I was tired
> of him telling me what he said here wasn't the truth here.   I just
> wanted to have something solid.

> Q.   Isn't it a fact that you knew that you were going to file an appeal in
> connection with your conviction.  You wanted to get something that
> would assist you in prosecuting that appeal?

> A.   I didn't even think we decided to file at that point, no.  I just did it
> because I was really upset with Jack.  I just wanted to have something

that I – that was solid.  No.

Q.      Sold [*sic*] for what purpose?

A.      For my own purpose.

Q.      Your own purpose.  No courtroom purpose.  Never intended?

A.      No.

(Sept. Hr'g Tr. 192:25, 193:1-20.)

Whatever her motive, DeMarco did refer to the decision to testify during the second recorded conversation.  She asserted, "It wasn't my decision though." (Telephone Tr. #2, 9:17.)  McMahon did not acknowledge this assertion during the conversation but instead kept talking as if she never said it.  (Id. at 9:18-20.) Respondent, in its opposition brief, correctly states that DeMarco never directly asked McMahon, in either recorded telephone conversation, why he did not inform her of her right to testify.  (Resp't Br. 6.)

Third, DeMarco testified at the September hearing that McMahon threatened to quit if she testified on her behalf.  In a rather lurid fashion, she testified that:

> [H]e told me that if I testified, well, one he would quit and I thought my God, I won't have a lawyer for those last couple of days.  And, two, that I would be taken off in shackles and chains.  And I thought 20 years in shackles and chains, I mean that was terrifying to me.

(Sept. Hr'g Tr. 147:21-25, 148:1.)  McMahon denies ever making these comments.  (Id. at 76:25, 77:1.)  DeMarco maintains this story in her Brief.  (See Pet'r Br. 17).  As for DeMarco's witnesses who testified in support of these and other alleged facts, Respondent contends that their testimony, along with DeMarco herself, is "wholly incredible."  (Resp't Br. 7 n. 3.)

17

DeMarco disputes Respondent's contention that she did not suffer actual prejudice by not testifying at trial.  Specifically, her reply brief states that "[t]he government's statements that the Petitioner's admission to a small amount of misspent funds, for a barbecue grill and a hotel stay after her home was raided amounts to an admission of fraud is contrary to well established law."  (Pet'r Reply Br. 14.)  She further contends in her 'Statement of Facts' that her

> testimony that her former attorney told her that it was his decision is supported by *overwhelming evidence* including the testimony of her witnesses and by logical inferences as to what Mr. McMahon would have said at and about several critical interchanges were his version of events correct and true.

(Pet'r Reply Br. 9) (emphasis added).  With these considerations in mind, the Court examines the instant issue.

## II. Relevant Standards

A petition filed pursuant to 28 U.S.C. § 2255 constitutes a collateral attack on the validity of a sentence.  See United States v. Eakman, 378 F.3d 294, 297 (3d Cir. 2004).  That statute provides in pertinent part:

> A petitioner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

See 28 U.S.C. § 2255.  A petitioner is entitled to habeas corpus relief under Section 2255 if the error amounts to "a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure."  United States v. Cleary, 46 F.3d 307, 310-11 (3d Cir. 1995) (quoting United

States v. DeLuca, 889 F.2d 503, 506 (3d Cir. 1989), cert. denied, 506 U.S. 895, 113 S. Ct. 270, 121 L.Ed.2d. 199 (1992)).  The burden is on the petitioner to establish her claim in the petition.  See Gov't of Virgin Islands v. Nicholas, 759 F.2d 1073, 1081 (3d Cir. 1985).

A fundamental defect of this sort may result from ineffective assistance of counsel.  Therefore, "a convicted defendant may assert a claim [under Section 2255] that the trial attorney gave ineffective assistance under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984), by failing to advise the defendant of ... her right to testify."  United States v. Pennycooke, 65 F.3d 9, 13 (3d Cir. 1995).  In doing so, the two-prong test of Strickland governs the claim.  Cf. Pennycooke, supra, at 13; see also Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (holding in part that "a criminal defendant's claim that his trial counsel was constitutionally ineffective because trial counsel failed to inform him of his right to testify ... must satisfy the two-prong test established in Strickland v. Washington").

According to that seminal case, a convicted defendant must first show that the performance of counsel was somehow deficient.  Strickland, 466 U.S. at 687.  Deficiency is present when counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  If deficiency is shown, a convicted defendant must then show that the deficiency actually "prejudiced the defense."  Id.  "Unless a defendant makes *both showings*, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable."  Id. (emphasis added).  Notably, "[j]udicial scrutiny of counsel's performance must be highly deferential ."  Marshall v. Cathel, 428 F.3d 452, 462 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 689).  This deference is afforded because

19

"counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, supra, at 690.

### III. Discussion

Petitioner grounds her ineffective assistance of counsel claim on the allegation that her trial attorney, Jack McMahon, never informed her that the decision to testify was her's to make. Petitioner also contends that she "repeatedly asked her lawyer to testify, and he repeatedly told her no, effectively nullifying her right to testify." (Pet'r Br. 37.) By doing so, Petitioner evokes United States v. Pennycooke. 65 F.3d 9 (3d Cir. 1995). In that case, the Third Circuit carved an exception out of the general rule that a Court should not "advise the defendant of the right to testify or to obtain an on-the-record waiver of such right." Id. at 13. The Third Circuit specifically recognized that

> [w]here, in furtherance of trial strategy, defense counsel *nullifies a defendant's right to testify* over the defendant's protest, the defendant clearly has been denied the right to testify. In such a case, it may be advisable that the trial court inquire discreetly into the disagreement and ensure that constitutional rights are not suppressed wrongly.

Id. (emphasis added). Finally, Petitioner contends that McMahon threatened to quit if she decided to testify. Given these contentions, Petitioner concludes that McMahon was constitutionally deficient in his representation during trial, and that this Court should have engaged in a colloquy to ascertain whether a knowing, intelligent, and voluntary waiver of the right to testify had been secured. Petitioner also contends that, had she been able to testify, there is a reasonable probability that the result of the trial would have been different. (Pet'r Br. 37 (citing Strickland, 466 U.S. at 694).)

Respondent United States contends that Petitioner has failed to prove that

20

McMahon "did not properly advise her of her right to testify." (Resp't Br. 15.)
Respondent further contends that Petitioner merely followed the professional advice of
McMahon, ultimately deciding on her own not to testify. (Id.) Next, Respondent
contends that even if McMahon failed to advise her of her right to testify, or somehow
prevented her from testifying, Petitioner still cannot show that she was actually
prejudiced as a result. (Resp't Br. 11.) To substantiate this claim, Respondents
reference the September hearing during which Petitioner stated that, had she testified,
she would have admitted to misusing patient funds. (Resp't Br. 14.) As these arguments
address the two-prong test of Strickland, they are examined in turn.

### A. Deficiency of Performance

Reasonably effective assistance is "the proper standard for attorney
performance". Strickland, 466 U.S. at 687. In this context, reasonableness is measured
by "prevailing professional norms." Id. at 688. An attorney falls below these norms
when he or she fails to advise the defendant of her right to testify. Cf. Pennycooke, 65
F.3d at 13. This conclusion follows from the firmly established rule that "a criminal
defendant has a right to testify on his or her behalf." See United States v. Lore, 26 F.
Supp. 2d. 729, 734 (D.N.J. 1998) (citing Rock v. Arkansas, 483 U.S. 44, 49-53 (1987)).

Petitioner's claim closely resembles the one presented in United States v. Lore.
In Lore, the petitioner claimed "that he was not permitted to testify because his
attorney's strong will overpowered his own", and that "he was unaware that it was his
decision to make and not his attorney's." See Lore, 26 F. Supp. 2d 729, 736 (D.N.J.
1998). In contrast to the evidence presented in this case, the evidence in support of that
case was indeed overwhelming. For example, the petitioner's trial counsel testified at

21

the § 2255 hearing–"[t]here's no question about the fact that he wanted to testify and I didn't want him to, so in that context there's no question I coerced him." Id. at 732 (citation omitted). The trial counsel further admitted that he never informed his client of the right to testify, or that he could overrule his own professional judgment to take the stand. Id.

Like Lore, Petitioner here alleges that her trial counsel never informed her of the right to testify, and was overbearing in the process. Unlike Lore, however, there is little credible evidence to substantiate Petitioner's claim. First of all, Jack McMahon vehemently denies Petitioner's allegation. Petitioner rejects his testimony as unreliable because, according to her, he "made several statements that conflict with his testimony to this Court that he repeatedly advised" DeMarco that it was her right to chose whether or not to testify. (Pet'r Br. 4.) In support of this contention, Petitioner cites the following portions of McMahon's testimony:

> [W]hen you first talk to a client and they're a doctor and they're intelligent and they're charged with fraud, your first inclination is, well, this might be someone *I can put on the stand*.

(McMahon Dep. 56:13-16) (emphasis added).

> I think her heart was in the right place, and I clearly, for me, as a trial lawyer, it's a very difficult decision whether or not *to put your client on the stand*.

(Id. at 60:5-9) (emphasis added).

With respect to the second statement, it is consistent with his statement to Ms. Moos where he said he "agonized" over the potential testimony of Petitioner. (See June Hr'g 100:13.) As a trial attorney defending his client, the implication of this difficulty or agony speaks more to his diligent representation than the alleged usurpation of his

client's decision.  Moreover, while the decision to testify ultimately rests with the client, it is a decision that can and should be reached through collaboration of attorney and client.  See Pennycooke, 65 F.3d at 11 ("the determination of whether the defendant will testify is an important part of trial strategy best left to the *defendant and counsel...*") (emphasis added).  With respect to the first statement–"someone I can put on the stand", once again, no contradiction arises.  The notion of calling a favorable witness to the stand is far different from the process of decision making that leads to that result.  As a result, neither of the above statements discredit McMahon or make his testimony anything less than reliable.

Petitioner also contends that McMahon is unreliable because he denied that Petitioner tried to stand up at the end of trial.  (Pet'r Br. 5.)  McMahon testified, "That did not happen.  That didn't happen.  Let me tell you something, Charlene is not stupid." (McMahon Dep. 59:21-23.)  Petitioner contends that McMahon's denial is "refuted" by the testimony of herself and Lynn Rotelli.  (Pet'r Br. 5.)  Yet, as noted in Part II.B and C, supra, neither Petitioner nor Rotelli are credible on this subject.  Their testimony contains wild inconsistencies, and is bellied by the trial record demonstrating a measured and deliberate McMahon resting the case of Petitioner.  In short, it is Petitioner's testimony that is unreliable, not McMahon's.  This Court finds McMahon credible and reliable.

The Court also finds that he informed Petitioner of her right to decide whether to testify.  She thereafter knowingly, intelligently, and voluntarily waived her right to testify.  In this respect, McMahon was not deficient in his performance as trial counsel.  Pointedly, none of the witnesses who testified in support of Petitioner undercut his

credibility.  For example, although Ms. Moos felt that McMahon was the one "making the decisions", she had no testimony to offer regarding this specific decision.  And even her feeling that he was the one "making the decisions" arose from extremely limited exposure to McMahon– "we took a little walk out in the hall."  (June Hr'g 100:9.)  When juxtaposed with her complimenting McMahon on his closing,  (id. at 102:12.), Ms. Moos does little to help Petitioner's case.  Diane Reimer's testimony is similarly unpersuasive. In fact, she corroborates McMahon's testimony that he performed a mock cross-examination of Petitioner.  Even if she is correct that McMahon called Petitioner "kiddo", that moniker has little if any bearing on the instant issue.  Next, Ms. Licciardello painted a picture of  a crass McMahon, but like Ms. Moos, she offered no testimony as to the discussions McMahon had with Petitioner on the evening of December 5th or on the morning of December 6th.  It was during that relevant time when Petitioner told McMahon that she would not testify.  As for Ms. Rotelli, she testified only to the alleged incident that occurred prior to the defense resting its case. As that story has no basis in the record or fact, it does little to advance the cause of Petitioner.

For whatever reason, Petitioner repeatedly states that McMahon did nothing to document her waiver to testify.  (See, e.g., Pet'r Br. 9.) Yet, it is Petitioner who must show that McMahon was deficient by failing to inform her of the right to testify, see Strickland, 466 U.S. at 687, not McMahon.  Prudence may dictate that a criminal defense attorney document his or her client's waiver to testify, but this Court or the Constitution under which it operates does not require such a course of action.

Additionally, the Court emphasizes the significant colloquy that occurred on the

24

record on December 4, 2006. There, the fact that the decision to testify rested with

Petitioner was made clear by the Court and Petitioner's trial counsel. Petitioner's

contention that she did not hear the colloquy or, at minimum, only heard that word

"testify"–a word not even present in that exchange–is simply incredible. This colloquy

is significant because Petitioner also contends that McMahon nullified her right to

testify. As such, she contends that a waiver should have been secured on the record

pursuant to Pennycooke.

But even if this case were to fall into the narrow exception created by

Pennycooke, see supra, this Court is satisfied that it adequately and "discreetly" delved

into the issue so as to "ensure that constitutional rights [were] not suppressed wrongly."

Pennycooke, 65 F.3d at 13. In any event, because there was no reason to believe that

McMahon was "frustrating" Petitioner's right to testify, there was "no affirmative duty to

advise the defendant of the right to testify or to obtain an on-the-record waiver of such a

right." Id. An example from trial illustrates just the opposite. After the jury was

charged and retired to commence their deliberations, this Court made it a point to

acknowledge the exceptional lawyering in this case:

> Before we leave, let me say for the record that in my opinion this case was
> extremely well tried. I express no opinion with respect to what the verdict
> should be. That obviously is for the jury … The evidence was voluminous.
> Counsel had no problem efficiently proceeding through the evidence. The
> defense had no problem referring to those parts which it wanted to within the
> volume that was presented in the courtroom. And I think that the parties
> should understand that in this court's opinion, the lawyering was excellent.

(Trial Tr. 63:21-25, 64:1-8.) Thus, Petitioner's reliance on Pennycooke is misplaced.

Finally, Petitioner contends that McMahon threatened to quit if she testified.

Trial counsel may not threaten to quit to prevent a defendant from testifying. United

25

States ex rel. Wilcox v. Johnson, 555 F.2d 115, 120-121 (3d Cir. 1977).   In Wilcox, the trial attorney told the judge during a side bar that the defendant wished to testify over her professional recommendation.   Id. at 117.   She then told the judge that if the defendant was allowed to testify over her objection, "she would make a motion to withdraw as counsel."   Id.   Upon obtaining a favorable ruling, the defense counsel went to her client and told him that the judge would permit her to make the motion to withdraw if he insisted on testifying.   Id.   The defendant consequently decided not to testify.   Id.   Confronted with those undisputed facts, the Third Circuit held that the defendant "was deprived of his fundamental right to a fair trial."   Id. at 121.

Here, Petitioner testified that McMahon threatened to quit if she testified.   She further testified that he envisioned "shackles and chains" for her if she did not relent. Other than her own testimony, however, she has no evidence to support these contentions.   McMahon denies ever making such a threat, so there is a dispute as to whether the threat was even made.   Accordingly, the facts of the instant case are inapposite with the facts of Wilcox.   Finding McMahon's testimony credible, Petitioner's allegation does not carry the day.

In sum, Petitioner has not shown that McMahon was deficient in his trial performance.   She therefore fails to satisfy the first prong of the Strickland test.   To prevail on an ineffective assistance of counsel claim under Strickland, Petitioner must show *both* deficiency and prejudice.   Strickland, 466 U.S. at 687.   Because Petitioner has failed to show deficiency, an examination of the second prong of Strickland is unnecessary.   Nevertheless, the Court does so for the sake of completeness.

26

## B. Prejudice

Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Here, Petitioner contends that if she testified, then the result of trial would have been different. In support of this contention, Petitioner's Brief states:

> One cannot state that her testimony would have been futile under these facts, since *the essence of the government's case went to her ability to provide the procedure*. Once that hurdle was overcome, Dr. DeMarco's credibility would be enhanced and the credibility of government witnesses who claimed she did not have that ability would have been undermined.

(Pet'r Br. at 38) (emphasis added). Respondent disputes Petitioner's characterization of the "essence" of the case. In its view, "her ability to provide the procedure" was not "the essence of the government's case"; (see Pet'r Br., supra, 38), rather,

> [t]he crux of the Government's case against DeMarco was that she: (a) represented to prospective patients that she could perform a certain medical procedure; (b) took money from prospective patients under the guise that such funds would be used for the medical procedure; and (c) misused the funds by diverting them for her own personal use.

(Resp't Br. 12 (citing Indictment at ¶¶ 16, 18(g), 18(n), and 18(r)).) In short, Respondent's characterization is correct. Petitioner's own witness Diane Reimer understood as much to be true– "the crux of the trial is about money." (June Hr'g Tr. 111:17.) Thus, Petitioner's ability to provide the procedure had no bearing on whether she took money for one purpose, and used it for another purpose. Given the numerous witnesses and exhibits put forth by the Government at trial, the jury could then infer the intent from circumstantial evidence.

Consistent with this understanding of the case, McMahon testified that his "main

defense" during trial was the intent requirement of fraud. (McMahon Dep. 22:21-24.)

> That was the focus of the defense in this case, that this was a fraud case and she had to have the intent to, when she took the money, at that time, ... that she didn't intend to perform the services that she did. It's clear all throughout the trial that was my defense.

(Id. at 22:24, 23:1-5.) The problem that arose at trial for Petitioner was the lack of a

single receipt to show that she purchased something commensurate with the purpose of

the initial transaction.

> She said, I bought that, I bought all those microscopes, I bought various sundry of equipment for the purposes of doing more research. I said, okay. That's great. That's good because then that can deflate the intent aspect of it. So I said where are the receipts for these things? Where is something to show me that you bought these things other than you just saying you bought these things and they're not even there.
>
> ...
>
> Her and Liza were there ... They would go and say ... We can get that. We can show we bought it. I said, Where did you buy it? Oh, we bought it on eBay or we bought it from a medical supply place that gives discounts to cash. Fine.
>
> ...
>
> I said, Look, what we need is something to back up that you bought these items, something. They never, in the whole course of talking to me, never presented me with one single documentation to show that they purchased anything that they said they purchased, and the records that were – that they did obtain, showed nothing but non-scientific purchases ... I desperately wanted that in this case to defend the case.

(Id. at 40:10-24, 41:1-20.) McMahon never put forth any receipt because there were

none. Even if Petitioner testified credibly about her ability to provide the stem cell

procedure, that testimony could not overcome the fact that money was taken for one

purpose and then spent for another.

Indeed, Petitioner states that if she testified at trial, she would have admitted to

28

misusing some of the patient funds to purchase a barbecue and a three-night stay at a hotel and winery.  Respondent contends that this admission "would have crippled DeMarco's attempt to persuade the jury that she had not improperly used patient funds."  (Resp't Br. 14.)  Respondent further contends that Petitioner's admission that she would withdraw cash from various automated teller machines ("ATMs"), purchase money orders at "a Wawa, Rite-Aid or other place that sold money orders ... [and] then travel to the post office where she would mail the money order to a medical equipment supplier", would have been revealed on cross-examination in further detriment to her case.  (Resp't Br. 14 (citing June Hr'g 171-172).)  This "tortured path" of financial dealing, Respondent contends, is inconsistent with the urgency of her patients' failing health.  (Resp't Br. 14.)  The Court agrees.  Rather than help her case, it is evident that Petitioner's testimony would have served as an added detriment.

The Supreme Court ruled that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or the jury." Strickland, 466 U.S. at 695.  A comprehensive analysis is important because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Id. at 696.  This rule is similar to the standard recently announced in a Rule 33 case.[6] See, e.g., United States v. Kelly, 539 F.3d 172, 182 (3d Cir. 2008) ("the district court cannot view the proffered testimony in a vacuum; it must weigh the testimony against all of the other evidence in the record, including the

---

[6]     Federal Rule of Criminal Procedure 33 states in relevant part, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  Fed. R. Crim. P. 33.

evidence already weighed and considered by the jury in the defendant's first trial.").

In this case, the evidence proffered by the Government was substantial. Several people who held block parties to raise money for the patients testified that they felt betrayed by Petitioner. Victims testified. In addition to that testimony, the government put forth evidence showing monies placed in an account only to be withdrawn to purchase personal items and no medical equipment.

In addition, Petitioner's proffered testimony would have included admissions of misused funds, scant record keeping, and repeated use of ATM transactions followed by convenience-store purchased money orders. When placed in the proper context of trial, it is impossible to say that Petitioner's proffered testimony is "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Petitioner further indicated that she would have pointed to medical supplies in the courtroom and testified about their function. Such an approach does little if anything to connect the money to the items in a court of law.

Simply put, Petitioner cannot satisfy the second prong of the Strickland test. Even if Petitioner's trial counsel was deficient, which this Court found he was not, Petitioner has not shown that she was prejudiced as a result of any alleged deficiencies of McMahon. Therefore, Petitioner's motion must be denied.

## IV. Conclusion

For the foregoing reasons, Petitioner Charlene C. DeMarco's petition under 28 U.S.C. § 2255 to vacate, set aside, or correct her sentence is denied. Petitioner has not shown that her trial attorney, Jack McMahon, was deficient in his performance such that he functioned below prevailing professional norms. Additionally, Petitioner has not

30

shown that she incurred prejudice such that the result of the proceeding would have been different if she testified.  As a result, Petitioner has not satisfied the two-prong test for ineffective assistance of counsel under <u>Strickland v. Washington</u>.


                                        /S/ Joseph H. Rodriguez
                                            U.S.D.J.

Date: <u>March 9, 2009</u>